UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

UNITED STATES OF AMERICA

v.                                                                    5:08-cr-34-Oc-10GRJ

EDGAR HERNANDEZ-PEREZ
_____

## REPORT AND RECOMMENDATION[1]

Pending before the Court are Defendant's Motion to Suppress Evidence Seized

As A Result Of The Unlawful Detention Of The Defendant (Doc. 26) and Defendant's

Amended Motion To Suppress Statements. (Doc. 27.)  The United States has filed a

Memorandum In Opposition To Motions To Suppress.  (Doc. 37.)  An evidentiary

hearing was held before the undersigned on August 7, 2008 and, accordingly, the

matter is ripe for review.  For the reasons discussed below Defendant's Motions to

Suppress Evidence and Statements are due to be **DENIED**.

## I. Introduction

Defendant is charged in this case in two counts of a three count indictment with

transportation of illegal aliens and illegal entry of an alien in violation of Title 8, United

States Code §§ 1324(a)(1)(A)(ii) and (B)(i) and 1325(a)(1).

The events that led to Defendant's arrest began on May 20, 2008 at

approximately 8:21 a.m. when Florida Highway Patrol Trooper Michael Eyes initiated a

traffic stop on a 2000 Toyota Sienna minivan that Co-Defendant Oscar Buendia-

---

[1] Specific, written objections may be filed in accordance with 28 U.S.C. § 636, and Rule 6.02,
Local Rules, United States District Court, Middle District of Florida, within ten (10) days after service of this
document.  Failure to file timely objections shall bar the party from a *de novo* determination by a district
judge and from attacking factual findings on appeal.

Hernandez, (hereinafter the "driver"), was driving.  Defendant was seated in the front passenger seat of the vehicle and was one of nine individuals located in the vehicle (including the driver), all of whom were illegal aliens.  Trooper Eyes contacted the United States Border Patrol who responded to the scene of the traffic stop.  The Defendant was taken into custody by Federal Border Patrol agents, and the next day during an interview by Agent Partain, of the Border Patrol, the Defendant made inculpatory statements. Additionally, during a search conducted subsequent to the traffic stop agents found approximately $700.00 in United States Currency on the Defendant, as well as, a Mexican identification card.  Defendant contends that the statements, currency, and identification card should be suppressed because they were obtained as a result of a prolonged detention of the Defendant.  According to the Defendant, Trooper Eyes lacked the required reasonable suspicion of criminal activity or probable cause to detain Defendant beyond the time for conducting a routine traffic stop and therefore the statements, currency, identification card and papers, constitute fruits of the unlawful detention. Additionally, Defendant contends that the statements he made to Agent Partain during his interview should be suppressed because the statements were coerced and were made in violation of his Sixth Amendment right to counsel.

## II.  Evidence and Testimony

The United States called Trooper Michael Eyes and Border Patrol Agents Robert Gilmore, Richard Cole and Robert Partain as witnesses.  The Defendant testified on his own behalf.

On May 20, 2008, Trooper Michael Eyes was working Interstate 75 as part of his duty to investigate and enforce the traffic laws of the State of Florida.  Trooper Eyes

was parked northbound in the median of I-75 monitoring southbound traffic near mile marker 327 in Sumter County.  At approximately 8:21 a.m., Trooper Eyes observed two vehicles traveling southbound.  Less than 9 feet from the front vehicle, was a 2000 green Toyota Sienna minivan.  Because the Toyota minivan was following too closely to the front vehicle, Trooper Eyes conducted a traffic stop.

When the vehicle pulled over, Trooper Eyes observed that the Toyota minivan had a California license plate. Trooper Eyes approached the minivan from the passenger side for safety and as he got near the passenger side window he was overcome with the smell of body odor and urine.  Inside the vehicle, Trooper Eyes observed a driver ( Oscar Buendia-Hernandez), a passenger in the front seat (the Defendant) and seven passengers in the two back seats.  The passengers were comprised of seven males and two females and Trooper Eyes noted that they were "unusually dressed."  Other than two passengers who appeared to be teenagers, the other passengers all appeared to be adults.  The driver only spoke broken English, which made it difficult for Trooper Eyes to communicate with him. The remaining passengers, including the Defendant, only spoke Spanish.  Defendant did not make any statements at the scene of the traffic stop.  The passengers could not produce identification and appeared to Trooper Eyes to be illegal aliens.  The driver produced a Washington driver's license and told Trooper Eyes that he had driven the minivan cross country from Washington into California and then to Florida. Because Trooper Eyes could not communicate with any of the other occupants and because of the strong smell of body odor and urine he suspected that the occupants were illegally in the United States. Consequently, Trooper Eyes promptly contacted Border Patrol for assistance.

3

Because Trooper Eyes could not tolerate the strong smell of urine coming from the vehicle, he asked the driver to accompany him to the front of his patrol car to discuss the circumstances of the traffic stop. Trooper Eyes ran a records check on the vehicle, which disclosed that the driver was not the registered owner of the vehicle and that the vehicle was registered to an individual in California.  The driver told Trooper Eyes that the vehicle belonged to a friend and that he was borrowing it.  Trooper Eyes testified that the computer in his vehicle, which he uses to run registrations, is particularly slow on out of state registrations and licenses.  According to Trooper Eyes, before he had completed the traffic stop, Agent Robert Gilmore, U.S. Border Patrol, arrived on the scene. Trooper Eyes estimated that Agent Gilmore arrived approximately fifteen to twenty minutes after the minivan had been stopped.

Agent Robert Gilmore is the patrol agent in charge of the Orlando office of the U.S. Border Patrol and has been a Border Patrol agent since 1988. As a Border Patrol agent,  Agent Gilmore conducts highway operations specifically to assess and target actual human smuggling that is occurring on Florida's highways, specifically, Interstate 75.  According to Agent Gilmore,  I-75 is a major corridor for alien smuggling loads which originate from the southwest.  Smugglers cross illegal aliens through the desert and into staging areas in California and then transport the aliens to the Fort Myers area utilizing I-75.

Agent Gilmore testified that he arrived at the scene of the traffic stop at approximately 8:51 a.m.  He was contacted by the Tampa station at 8:45 a.m., and was advised that the Trooper had requested assistance.  Agent Gilmore testified that it only took him six minutes to arrive because he had been patrolling I- 75 not very far from

where Trooper Eyes stopped the minivan.

Upon arrival at the scene Agent Gilmore spoke with Trooper Eyes who told him that there were nine individuals in the minivan who only spoke Spanish and that there was a strong urine smell inside of the vehicle.  Upon observing the vehicle himself, Agent Gilmore observed nine individuals inside of a minivan with a California tag.  Agent Gilmore approached the driver and asked him about his citizenship.  The driver told Agent Gilmore that he was from El Salvador and not legally in the United States and that the other passengers were from Mexico and Honduras and did not have documents to be in the United States.

Agent Gilmore observed that there was very little luggage in the van and that there was a urine bottle on top of the luggage.[2]  Agent Gilmore testified that urine bottles are commonly used by individuals to relieve themselves to avoid having to stop the vehicle. This is a concern to smugglers because final payment in many cases is not made until they reach the destination. If the vehicle is forced to stop there is a risk that the passengers can run away without making full payment. Agent Gilmore made sure that the occupants of the minivan remained in the vehicle to insure they would not run away until back-up Border Patrol agents arrived to assist him. Before transporting the Defendant and the other passengers back to the Orlando Border Patrol station, Agent Gilmore obtained identification from some of the passengers and later received information that they were illegal.  Additionally, at some point agents found $718.00 on the Defendant, as well as, his Mexican driver's license.

---

[2]  Government Ex. 1.  Photograph of two suitcases and container filled with urine.

Shortly after Agent Gilmore arrived at the scene of the traffic stop, Agent Richard Cole, United States Border Patrol, responded to the scene of the traffic stop.  Agent Cole recalled the strong smell of body odor and urine coming from inside the vehicle.  Agent Cole testified that the Defendant appeared to be dressed differently from the other passengers.  The other passengers were dirty, had a strong body odor, wore "worn, old clothing with beat up shoes" and had the appearance of poor individuals from Mexico who did not have very much.  Agent Cole observed that the Defendant was wearing clean clothes and shoes and did not appear "as if he had walked across the border through the desert."  Agent Cole testified that because of the difference in the appearance of the Defendant from the other passengers he "felt like [the Defendant] was the smuggler."

Once the other Border Patrol agents arrived Agent Gilmore and the other agents removed all of the occupants from the minivan - and because the driver had admitted they were all illegally in the United States - placed all of them under administrative detention.  Defendant, the driver, and other passengers were then transported back to the Orlando Border Patrol station for verification of their illegality, documentation and to begin the deportation process.

After they arrived at the Orlando Border Patrol Station, Agent Gilmore interviewed the passengers and driver first.  During his interview, the driver confirmed to Agent Gilmore that all of the occupants of the minivan were illegally in the United States and that none of them had documents to be in the United States legally.  Agent Gilmore then interviewed the Defendant who was advised of his *Miranda* rights in written form in

6

Spanish.[3]  Agent Gilmore testified that the Defendant signed this form and it was witnessed by two agents.  According to Agent Gilmore, Defendant did not request counsel and stated that he was in this country illegally.

On May 21, 2008, a day after the administrative detention, the driver, passengers and the Defendant were all interviewed by Agent Robert Partain, the prosecuting agent in the Orlando office of the United States Border Patrol.  Agent Robert Partain is a twenty year veteran whose primary assignment is to investigate terrorism, weapons of mass destruction and the smuggling of people or contraband.  Agent Partain conducted the interviews the day after the stop because he had been on leave on May 20, 2008, the day of the traffic stop.

Agent Partain interviewed the passengers first.  During these interviews and after a waiver of their *Miranda* rights, the passengers stated that they had paid fees ranging from $500.00 to $4,000.00 to be smuggled into Fort Myers.[4]  Agent Gilmore also learned that the passengers paid the Defendant $800.00 up front.  All of the passengers acknowledged they were in the United States illegally.

Agent Partain then interviewed the driver, who had also waived his *Miranda* rights.[5] The driver told Agent Partain that the Defendant approached him and asked him to help drive the minivan with the illegal aliens to Florida.

Agent Partain interviewed the Defendant last.  Agent Partain testified that

---

[3]  Government Ex. 3, advisement and waiver of rights form.

[4]  Agent Partain testified that the difference in fee was directly related to the distance of travel, the further away a person was from the United States, the higher the fee.

[5]  Government Ex. 4, advisement and waiver of rights for the driver Oscar Buendia-Hernandez.

Defendant was orally re-read his *Miranda* rights and that during the course of the interview the Defendant never once requested an attorney.  The initial impression of Agent Partain was that the Defendant was "extremely dishonest" and that he was ignoring the agent's questioning.  In order to get the Defendant's attention, Agent Partain slapped the desk and spoke in an strong voice. Agent Partain denied that he threatened additional charges if the Defendant did not cooperate.  Defendant eventually admitted that he had been paid $800.00 to transport the illegal aliens and that he had recruited the driver to help him because the driver had a Washington driver's license. According to Agent Partain, the interview lasted for about fifty minutes.

The Defendant testified on his own behalf.  Defendant stated that he felt threatened by Agent Partain because he raised his voice and struck the table with his hand and foot.  Defendant testified that although he thought he might need an attorney he never asked for an attorney. Defendant said that Agent Partain told him that if he did not cooperate, he would receive thirty years, but if he did cooperate he would get one or two years.  Although the Defendant acknowledged that he "reads well," Defendant denied reading the *Miranda* rights waiver form and testified that he just signed it.

### III.  ANALYSIS OF ISSUES

#### A.      The Duration Of The Traffic Stop Was Not Unconstitutional

The Defendant does not challenge that there was probable cause for the traffic stop and therefore does not argue that the traffic stop itself was unconstitutional. Rather, the Defendant argued at the hearing that his continued detention during the traffic stop was unconstitutional because it was prolonged without any articulable facts

to support the continued detention. According to the Defendant, because Trooper Eyes and the Border Patrol agents lacked reasonable suspicion of criminal activity for the extended duration of the stop the statements and evidence obtained as a result of the traffic stop are "fruit of the poisonous tree" and should be suppressed.

Under *Terry*, an officer's actions during a traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place.[6] Furthermore, the duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop.[7]  The traffic stop may not last "any longer than necessary to process the traffic violation" unless there is articulable suspicion of other illegal activity.[8]  However, where an officer makes a legal stop, an officer has "the duty to investigate suspicious circumstances that then come to his attention."[9]  The officer can lawfully ask questions, even questions not strictly related to the traffic stop, while waiting for a computer check of registration or examining a driver's license so long as it does not "prolong beyond the time reasonably required to compete that mission."[10] Furthermore, an officer can lengthen the detention if he has reasonable suspicion of illegal activity other than the traffic violation, or if the detention has become a

---

[6]  Terry v. Ohio, 392 U.S. 1 (1968).

[7]  United States v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999).

[8]  United States v. Holloman, 113 F.3d 192, 196 (11th Cir. 1997).

[9]  See United States v. Cantu, 227 Fed. Appx. 783, 785 (11th Cir. 2007) citing United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991).

[10]  Illinois v. Caballes, 543 U.S. 405, 407 (2005).

consensual encounter.[11]

Defendant claims that his detention exceeded the duration of a constitutional traffic stop because it lasted longer than necessary to process the traffic violation. Neither the evidence nor the law support Defendant's argument.

Only thirty minutes had elapsed between the time Trooper Eyes observed the traffic violation and the time Agent Gilmore arrived. During this period of time Trooper Eyes contacted Border Patrol sometime before 8:45 a.m., which is less than twenty-five minutes from the time the stop was initiated. Agent Gilmore arrived on the scene at 8:51 a.m., only six minutes after he was called to assist Trooper Eyes. During the time period before Agent Gilmore arrived Trooper Eyes had attempted unsuccessfully to speak with the occupants because they only spoke Spanish and had instructed the driver to step out of the vehicle and stand in front of his patrol vehicle because he could not tolerate the odor coming from the minivan. Trooper Eyes then had to run the out of state license and the out of state vehicle registration on his computer, which he testified is normally very slow. Notably, Trooper Eyes testified that he had not even completed the traffic stop or issued the citation to the driver when Agent Gilmore arrived. The Defendant did not present any evidence to suggest that Trooper Eyes did anything to lengthen the traffic stop.  It is perfectly permissible for an officer, as here, to prolong a traffic stop to investigate the driver's license and the vehicle registration,[12] and he may do so by

---

[11] United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999).

[12] Delware v. Prouse, 440 U.S. 648,657-659 (1979).

10

requesting a computer check.[13] Accordingly, because Trooper Eyes had not concluded

the traffic stop prior to the time when Border Patrol agents arrived the detention was not

unconstitutionally prolonged.[14]

    While the Court recognizes that the determination of whether a traffic stop is

unconstitutionally prolonged should be based upon the facts and circumstances of each

case and not simply the length of time of the traffic stop, nonetheless, the Eleventh

Circuit has routinely found traffic stops of short duration, like the stop in this case, not to

be unconstitutional[15]

    Furthermore, a police officer is authorized to continue a traffic stop to investigate

suspicious circumstances that come to his attention.[16] Reasonable suspicion requires

that the officer "be able to point to specific and articulable facts which, taken together

with rational inferences from those facts, reasonably warrant that intrusion.[17]

Reasonable suspicion is determined based upon the  totality of the circumstances.[18]

    Trooper Eyes had sufficient articulable facts to detain the minivan, and its

---

[13] United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999).

[14] See United States v. Zucco, 71 F.3d 188, 190 (5th Cir. 1995) (detention supported by facts justifying its initiation while officer waits for computer check).

[15] See, e.g. United States v. Hardy, 855 F.2d 753, 761 (11th Cir. 1988) (approving traffic stop of fifty minutes in duration); United States v. Hernandez 418 F.3d 1206, 1212 n. 7 ("Where at its inception a traffic stop is a valid one for a violation of the law, we doubt that a resultant seizure of no more than seventeen minutes can ever be unconstitutional on account of its duration: the detention is too short."); United States v. Monzon-Gomez, 244 Fed.Appx. 954, 960 (11th Cir. 2007)("the thirty minutes it took to confirm the deputies' suspicion was not unreasonably long."). see also, United States v. Shareef, 100 F.3d 1491, 1502 (10th Cir. 1996) (30 minute wait for computer check during a traffic stop reasonable).

[16] United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991).

[17] United States v. Tapia, 912 F.2d 1367, 1370 (11th Cir. 1990).

[18] Id.

11

occupants, including the Defendant, because there was a reasonable suspicion that there was a possible violation of the law.  Trooper Eyes had stopped a  minivan with California license plates containing nine Hispanic passengers packed inside of the vehicle, none of whom spoke English and all of whom were wearing worn dirty clothing. The smell of body odor and urine coming from inside the minivan was so strong that Trooper Eyes could not even stand near the vehicle. The driver of the vehicle was not the registered owner and advised Trooper Eyes that he had borrowed the van. These facts coupled with the driver's statement that they had driven from Washington state, through California and across the country to Florida taken together was more than sufficient to alert a law enforcement officer (as well as anyone else with even a modicum of common sense) that the occupants of the vehicle may be illegal aliens. Indeed, that is what prompted Trooper Eyes early-on in the stop to contact Border Patrol for assistance. Of course, once Agent Gilmore arrived and the driver admitted that he was from El Salvador and all of the occupants were illegal aliens from Mexico and Honduras, reasonable suspicion ripened into probable cause, which led to the administrative detention of all of the occupants based upon their immigration status.

Accordingly, the Court concludes that there was no evidence that Trooper Eyes prolonged the traffic stop, and that even assuming the traffic stop had lasted longer than necessary, Trooper Eyes had more than sufficient articulable facts that the minivan contained illegal aliens sufficient to extend the stop until Border Patrol agents arrived. Once the Border Patrol arrived and learned that all of the occupants were in the United States illegally Trooper Eyes' reasonable suspicion ripened into probable cause to support the administrative detention of the Defendant, and the others. For these

12

reasons, the Court concludes that the Defendant's Fourth Amendment rights were not violated by the duration of the traffic stop and the Defendant's subsequent administrative detention by Border Patrol agents.

### B.  The Defendant's Fifth And Sixth Amendment Rights Were Not Violated

Defendant also contends that the statements he made to Agent Partain on May 21, 2008 during his questioning should be suppressed as a violation of his Fifth Amendment rights because his statements were induced by coercion and were not freely and voluntarily given. Secondly, in his Motion To Suppress Statements, Defendant argues that his statement should be suppressed because his Sixth Amendment right to counsel was violated when his request for counsel was ignored by Agent Partain.

### *Sixth Amendment Argument*

Defendant's Sixth Amendment argument can be disposed of summarily. Although Defendant argued in his motion that Agent Partain questioned him after he requested an attorney, Defendant testified at the hearing that he never told Agent Partain (or anyone else) that he wanted an attorney. Rather, Defendant testified that he "thought" he might need an attorney but that he did not ask for one. Recognizing that there was no evidence to support his argument, Defendant's attorney conceded this point in his closing argument at the hearing. Accordingly, Defendant's motion to suppress based upon a Sixth Amendment violation is denied.

**Fifth Amendment Argument**

Defendant argues that Agent Partain's actions in raising his voice and slapping the table were coercive.  Further, Defendant suggests that his confession was involuntary because Agent Partain allegedly told him that if he did not cooperate he would be charged with additional crimes.

*Miranda* warnings must be given to all individuals prior to custodial interrogation.[19]  Defendant was advised of his *Miranda* warnings two times - one time in writing, in his native Spanish language on May 20, 2008, and the second time prior to the interview by Agent Partian when he orally advised the Defendant of his *Miranda* rights.  Even though *Miranda* warnings were given, the Court must still make a voluntariness inquiry. However, as the Supreme Court has observed time and again "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."[20]  In making the determination of whether a statement by a Defendant has been given voluntarily, or was the product of coercion, the Court must evaluate the totality of the circumstances.[21]

"Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so,

---

[19]  McCarty v. Herdman, 716 F.2d 361, 363 (1983).

[20] Dickerson v. United States, 530 U.S. 428, 444, 120 S.Ct. 2236, 2336 (2000), *citing,* Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138 (1984).

[21] Arizona v. Fulminante, 499 U.S. 279, 285-88, 111 S.Ct. 1246, 1251-53, 113 L.Ed.2d 302 (1991).

or the making of a promise that induces a confession."[22]

The interview of the Defendant in this case does not involve any conduct that even remotely comes close to meeting this definition of coercive. The interview lasted only about fifty minutes and never involved the use or threat of use of physical force. The only conduct of Agent Partain that Defendant points to as coercive is the fact that Agent Partain "slapped the table" and "raised his voice" to get the Defendant's attention. There is no suggestion that Agent Partain threatened to use his hands to strike the Defendant or made any threatening gestures that he would do so. The mere act of slapping a table (and not even hitting a table with a closed fist) coupled with a raised voice aimed at getting the attention of the Defendant during an interrogation that did not last for even one hour is not sufficiently coercive to make the Defendant's statement inadmissible because it was unconstitutionally compelled. This is especially so where, as here, there is no suggestion that Defendant is especially vulnerable to influence and where the Defendant was provided with *Miranda* warnings not once but twice. Accordingly, the Court finds that based on the totality of the circumstances, and the evidence (or lack thereof) presented at the hearing, that Defendant's statement was given voluntarily, was not compelled through coercion and, therefore, was not made in violation of the Defendant's Fifth Amendment rights.

Lastly, with regard to Defendant's claim that his statement was coerced because Agent Partain threatened to charge Defendant with additional charges if he did not cooperate this argument is due to be rejected for two reasons. First, while the

---

[22] United States v. Mendoza-Cecelia, 963 F.2d 1467 (11th Cir. 1992) (citing Colorado v. Connelly, 479 U.S. 157 (1986) n. 1).

Defendant testified that Agent Partain made this statement Agent Partain unequivocally

testified that he never made such a statement to the Defendant nor would he. Based

upon the demeanor of the Defendant as compared to the straight forward testimony

provided by Agent Partain, the Court has no hesitation concluding that the testimony of

Agent Partain was much more credible than the testimony of the Defendant.[23]

Secondly, even if Agent Partain had advised the Defendant of the range of

possible penalties[24] that is not unlawful because a law enforcement officer is permitted

to discuss with a defendant realistic penalties for cooperating versus non-cooperative

defendants and a promise by an agent that the agent would advise the Court of the

defendant's cooperation does not constitute coercion.[25]

Accordingly, for these reasons, the Court concludes that the statements made

by the Defendant during the interview were not coerced and, thus, were made

voluntarily.

---

[23] The credibility of the Defendant is also called into question by the fact that one of the grounds asserted in his motion to suppress was his claim that he was denied the right to talk to an attorney. At the hearing it became evident that this assertion was baseless and that the only mention of counsel was Defendant's statement that he thought he wanted an attorney even though he never told anyone he wanted to talk to an attorney.

[24] The range of possible penalties per alien under 8 U.S.C. § 1324(a)(1)(A)(ii) - the relevant provision that applies to the crime of illegally transporting aliens in the United States in situations as here where there is no claim of bodily injury or death of the alien - ranges from five years to ten years. Because an experienced agent like Agent Partain would know the relevant penalties for illegally transporting aliens Defendant's testimony that Agent Partain told him he would get thirty years if he did not cooperate and only two years if he cooperated, becomes that much more incredible and thus further supports the Court's conclusion that the testimony of the Defendant was not believable or trustworthy.

[25] See, e.g. Williams v. Johnson, 845 F.2d 906, 909 (11th Cir. 1988)(confession not involuntary where officer promised that defendant's cooperation would be made known to the appropriate authorities); United States v. Nash, 910 F.2d 749, 753 (11th Cir. 1990); United States v. Broussard, 80 F.3d 1025, 1034 (5th Cir. 1996); United States v. Ballard, 586 F.2d 1060, 1063 (5th Cir. 1978).

16

## IV.  <u>RECOMMENDATION</u>

In view of the foregoing, it is respectfully **RECOMMENDED** that Defendant's

Motion to Suppress Evidence Seized As A Result Of The Unlawful Detention Of The

Defendant (Doc. 26) and Defendant's Amended Motion To Suppress Statements (Doc.

27) should be **DENIED**.

**IN CHAMBERS** at Ocala, Florida, this 14th day of August, 2008.

_____
GARY R. JONES
United States Magistrate Judge

Copies to:
    Honorable Wm. Terrell Hodges
    Senior United States District Judge

    United States Attorney (Armstrong)
    Counsel for Defendant